CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED for
RWa
AUG 24 2007
JOHN F. CORCORAN, CLERK
BY: H McDonald
DEPUTY CLERK

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| LEROY A. LOVELACE, | ) | |
| **Plaintiff,** | ) | Civil Action No. 7:03cv00395 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| JACK LEE, et al., | ) | **By: Hon. Jackson L. Kiser** |
| **Defendants.** | ) | **Senior United States District Judge** |

This pro se complaint, brought pursuant to 42 U.S.C. § 1983 and the Religious Land Use and

Institutionalized Persons Act ("RLUIPA"), 42 U.S.C. §§ 2000cc et seq., is before the court on

remand from the United States Court of Appeals for the Fourth Circuit for further consideration of

plaintiff's claims against Warden Kathleen Bassett[1] in her official capacity and against Officer Lester

in his individual capacity. The Court remanded on the following issues: whether injunctive relief

should be entered against Warden Bassett regarding plaintiff's RLUIPA, free exercise, and

procedural due process claims; and whether Officer Lester acted intentionally to deny plaintiff his

rights under RLUIPA and the free exercise clause of the First Amendment. Warden Bassett has

submitted a motion for summary judgment, plaintiff has responded, and the Warden's motion is ripe

for disposition. For the reasons stated herein, summary judgment will be granted in favor of Warden

Bassett on plaintiff's RLUIPA and free exercise claims. A ruling on the Warden's motion for

---

[1] On April 4, 2007, Jack Lee moved to have Kathleen Bassett, the current warden at Keen Mountain Correctional Center ("KMCC"), substituted as a party defendant. Plaintiff filed a motion in opposition to Warden Bassett's substitution on April 11, 2007. The Court of Appeals' opinion in this case made clear that the warden at KMCC is not subject to an award of money damages and is only a party defendant at this juncture for the consideration of appropriate injunctive relief. Lovelace v. Lee, 472 F.3d 174 at 193-94 (4th Cir. 2006) (citing Madison v. Commonwealth of Va., 474 F.3d 118, 131-33 (4th Cir. 2006) (holding that a state's Eleventh Amendment immunity from suit for damages is not waived by RLUIPA) and Ridpath v. Bd. of Governors of Marshall Univ., 447 F.3d 292, 306 (4th Cir. 2006) (official capacity claim may proceed when non-monetary relief is sought and qualified immunity is not avaliable)). Moreover, Mr. Lee is no longer serving as the warden at KMCC and is no longer an employee of the Virginia Department of Corrections ("VDOC"), and thus is not in a position to comply with any declaratory or injunctive relief that this court could grant. Therefore, on May 7, 2007, the court granted the motion seeking the substitution of Warden Bassett for Mr. Lee.

summary judgment on plaintiff's procedural due process claim will be taken under advisement pending the Warden's submission of documentation to this court, within ten days of the entry of the order accompanying this memorandum opinion, that she has, in fact, promulgated certain rules that she avers to have instituted. The failure to submit such documentation to this court will result in the claim being transferred to the appropriate district court for further action. The remaining claims against Officer Lester will be transferred to the docket of the Honorable James P. Jones, Chief United States District Judge for the Western District of Virginia, for a jury trial.

## I. Factual and Procedural Summary[2]

On November 11, 2002, plaintiff was one of about seventy[3] KMCC inmates approved to participate in Ramadan observances.[4] The primary features of the Ramadan observance at KMCC in 2002 were that participants received their meals before sunup and after sunset, and participated in group prayer services that took place around those mealtimes.[5] However, on November 11, 2002,

---

[2] The facts have been adduced from the record, including the parties' submissions and, significantly, the Court of Appeals' opinion in this case.

[3] The Court of Appeals stated that plaintiff "was among approximately seventy inmates approved to participate in the 2002 Ramadan fast." 472 F.3d at 182. However, Warden Bassett, in her affidavit submitted with her memorandum in support of her motion for summary judgment, avers that, "[a]ccording to [KMCC] records, 176 inmates participated in 2002."

[4] Plaintiff is a member of the Nation of Islam ("NOI"). Observant Muslims fast between dawn and sunset during the thirty days of Ramadan, the Islamic holy month of fasting and prayer. In 2002, the month of Ramadan extended from November 5 through December 4.

[5] The Court of Appeals summarized the then-existing Ramadan policy at Keen Mountain:

On September 22, 2002, Warden Lee issued a policy to accommodate Keen Mountain inmates seeking to fast during the holy month of Ramadan. . . . According to the warden's policy, inmates approved to participate in the fast received special pre-dawn (5:00 to 5:50 a.m.) and post-sunset (6:00 to 7:30 p.m.) meals in two dining halls reserved for fasting inmates of various Islamic denominations: Dining Hall #1 for "World Community of Islam" inmates and Dining Hall #2 for [NOI] inmates.[] Prayer services were held either before or after the special breakfast meal in each reserved dining hall. Because participating inmates were expected to adhere to the

2

about six days into the Ramadan observance, plaintiff was removed from the list of participants ("pass list") after Officer Lester reported that he had seen Lovelace taking a lunch tray at approximately 12:35 that afternoon. The Court of Appeals observed that the events of November 11, 2002, began at breakfast when

> Lovelace and other fast participants discovered that "the milk being served [to them] was beyond its stamped expiration date." As NOI liaison, Lovelace informed the kitchen staff about the inmates' "refusal to accept the expired milk." Id. The breakfast staff then replaced the seventy to seventy-five individual servings of expired milk with fresh milk. Lovelace describes his interaction with staff as "contentious" and notes that Correctional Officer Lester was the security officer assigned to the kitchen that morning. Roughly twelve hours later, Lovelace was refused his special evening meal. He was informed that he had been removed from the pass list because, according to an incident report submitted by Officer Lester, he had taken a lunch tray at approximately 12:35 that afternoon, November 11. (The incident report is not in the record, and Lovelace has never seen it.)

Lovelace, 472 F.3d at 183 (internal citations omitted).

> Plaintiff resorted to the emergency grievance procedure, filing

> two emergency grievances that evening and two the following morning, asserting that he had not received a lunch tray and had not even entered the dining hall during fasting hours on November 11. The staff denied each of these grievances within several hours on grounds (1) that the grievances did not meet the definition of "emergency" (immediate risk of serious personal injury or irreparable harm) and (2) that Lovelace should instead "address any further complaints" by using the "inmate complaint/request" system. On November 12 Assistant Warden Shinault formally notified Lovelace in writing that he was barred from "participation in Ramadan"

---

rules of the fasting period as outlined by the World Community and NOI, they could not eat the regular cafeteria meals offered during the daytime. Warden Lee instructed security and food service staff to submit an incident report on any fast participant seen taking a meal tray during daylight hours. Any inmate who violated the policy would be removed from the Ramadan observance pass list, which meant that he would be barred from participating in the fast and, by extension, the morning prayer sessions.

472 F.3d at 182 (internal citations omitted). The Court noted that "[t]he phrase 'World Community of Islam' in the policy presumably refers to the worldwide Muslim community, of which the two main sects are Sunni and Shi'a. NOI is a denomination founded in the United States that considers itself a form of Islam." Id., slip op. at 3, n. 1.

because of his infraction the previous day. Proceeding as he had been instructed, Lovelace filed a complaint with Mike Shaw, the treatment program supervisor, on November 12 or 13. Shaw or his colleague responded on November 13 that "[t]his [matter] will be left to the Chaplain." Lovelace filed two additional complaints, one with the warden and one with the assistant warden, on November 13. Lovelace emphasized in the complaints, as he had in the emergency grievances, that he was being denied his right to participate in the Ramadan observance.

Id. (internal citations omitted).

Thereafter,

[o]n November 14 Lovelace met with Shinault and Shaw and suggested that they review certain evidence to correct Lester's misidentification and reinstate Lovelace to the Ramadan pass list. This evidence included cafeteria security (surveillance) tapes from the afternoon of November 11 and as many as twenty witnesses who were willing to attest that Lovelace had never left the housing unit during lunchtime that day. Shinault told Lovelace that before ruling on the complaint, he would meet with Lester and show him Lovelace's "face card," a photograph kept on file for every inmate, "to confirm Lester's identification of [Lovelace]." The following day, November 15, Shinault summoned Lovelace to a meeting and reiterated that Lovelace was ineligible to participate in the Ramadan program because of Lester's report, which Lester had "verified" (that is, confirmed). Shinault, however, had not shown Lester the face card as he had said he would. Nor had he reviewed the security tapes or interviewed witnesses, as Lovelace had urged.

Id. (internal citations omitted).

On November 20 or 21, 2002, plaintiff filed a formal grievance, to which

Warden Lee responded in a letter dated December 4 (the last day of Ramadan) that Lovelace's grievance was "unfounded." The warden's letter stated that two officers had spoken with Lester, who said he was "positive that it was [Lovelace] that he observed" eating a non-Ramadan meal. Lovelace appealed this Level I response to the regional director, asserting that prison officials and staff had failed to respond in a timely and judicious manner and thereby caused him irreparable injury. Regional Director Larry Huffman upheld Warden Lee's Level I decision with minimal comment. Huffman's Level II response was dated January 4, 2003, one month after the end of Ramadan. Thus, Lovelace was prevented from fasting and participating in the NOI congregational prayers for twenty-four of Ramadan's thirty days, from the evening of November 11 through the evening of December 4, 2002.

Id. at 183-84 (internal citations omitted).

4

Plaintiff, having properly exhausted his administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a), filed an action in this court on June 25, 2003, alleging that

> Warden Lee, Assistant Warden Shinault, and Officer Lester violated his First Amendment free exercise rights, his Fourteenth Amendment due process rights, and his statutory rights under RLUIPA, 42 U.S.C. §§ 2000cc et seq. Lovelace sought a declaratory judgment, injunctive relief, punitive damages, damages for emotional distress and other injuries, and the appointment of counsel. The complaint, read in its entirety, indicates that Lovelace sued Lester in his individual capacity and sued Lee and Shinault in their official and individual capacities.

Id. at 184.

> The Court of Appeals recapitulated the subsequent proceedings in this court:

> Shinault and Lester moved for summary judgment on September 10, 2003, before Lee was served with process. They attached to their motion an unexecuted affidavit from Lester. In this affidavit Lester acknowledged for the first time — more than nine months after the end of Ramadan — that he had misidentified another inmate as Lovelace. Lester said that the inmate who took the lunch tray on November 11, 2002, "resembled another inmate named Lovelace, who was no longer at the institution," and that he only realized this mistake "after the fact." In his response Lovelace challenged Lester's affidavit for being "unsigned and unnotarized" and therefore inadmissible in summary judgment proceedings. In addition, Lovelace submitted evidence to discredit the affidavit's contents. This evidence included (1) a staff member's statement, based on a data search, that no other inmate named Lovelace had been housed in the prison in the five years prior to September 22, 2003, and (2) Lovelace's own statement, made under penalty of perjury, that a "deeper search revealed no other Lovelace ever detained at [the Keen Mountain] facility" Lovelace further asserted that Lester's account of innocently mistaking his identity was incredible because Lester was familiar with Lovelace. In particular, Lester participated in a shakedown of Lovelace's cell (with Lovelace present) about six months prior to November 11, 2002; Lester on many occasions monitored the "chow hall line where . . . [Lovelace had] verbally identified himself" from a distance of roughly two feet; Lester had "numerous instances of incidental interaction with [Lovelace] in the course of normal daily inmate movement"; and Lester worked for three months in the control booth in Lovelace's housing unit.

Id. (internal citations omitted).

On October 17, 2003, Lester further emended his statement, submitting

> a second, executed affidavit in which he still admitted misidentifying Lovelace but changed his explanation. Instead of saying that he had confused Lovelace with another inmate named Lovelace who was no longer at the prison, Lester claimed that he had made an "honest . . . mistake[ ]" by confusing Lovelace with "another inmate at the institution that looked like Lovelace." Lester acknowledged that several inmates had "come to [him]" during Ramadan (as early as November 12, 2002, according to Lovelace's evidence) to dispute the identification, insisting that Lovelace had remained in his housing unit during the entire lunch period on November 11, 2002. Yet Lester again alleged, as he had in his first affidavit, that he did not realize his mistake until "after Ramadan was over," when "someone pointed inmate Lovelace out to [him]." Lovelace objected to Lester's second affidavit on grounds that it was untimely and "wholly different" from the first.

Id. at 184-85 (internal citations omitted). Over plaintiff's objection, this court took the second affidavit into consideration. Id.

Regarding Warden Lee, the Court observed that plaintiff "made several unsuccessful attempts to locate and serve process on" him; that he "was no longer Warden at Keen Mountain and no longer employed by the Virginia Department of Corrections"; and that U.S. Marshals "ultimately served Lee on February 18, 2004, although it is 'unclear . . . whether . . . [he] was served with a summons directing his response to the complaint.'" Id. at 185 (internal citations omitted). The Court continued:

> Lee did not respond, and marshals served him again on May 4, 2004. Lee did not respond within the time allowed and on May 28 moved for an enlargement of time, which Lovelace opposed. Before the district court ruled on this motion, Lee filed a motion for summary judgment that paralleled and incorporated by reference Shinault and Lester's earlier motion. Lovelace countered that Lee had defaulted and therefore lacked standing to move for summary judgment. The district court granted Lee's motion for enlargement of time, deemed his summary judgment motion to be timely filed, and denied Lovelace's motion for a default judgment.

> The district court granted summary judgment to Lee, Shinault, and Lester on September 13, 2004. The court concluded that the defendants were entitled to qualified immunity on the RLUIPA claim and that "no constitutional violation

6

occurred in relation to the free exercise claim [because] the actions of defendants were negligent rather than intentional." The court did not address Lovelace's due process claim. Lovelace filed a timely appeal and was subsequently assigned counsel.

Id. (internal citations omitted).

The Court of Appeals vacated summary judgment in favor of Officer Lester in his individual capacity on the RLUIPA and free exercise claims, vacated summary judgment in favor of Warden Lee regarding the claims asserted against him in his official capacity, and affirmed the remainder of this court's rulings. Id. at 181. The Court of Appeals held that "Lovelace's case may proceed against Officer Lester because 'Lovelace has presented an issue of triable fact as to whether correctional officer Lester intentionally violated his religious liberty,' and 'RLUIPA provides a cause of action to redress this type of infringement.'" Id. at 181-82 (citations omitted).

Regarding the claims against Warden Lee, the Court stated that remand "is necessary to ensure that the prison satisfies its obligation – an obligation it has not yet attempted to meet – to justify the Ramadan policy's broad restrictions of religious liberty," adding that, "according to RLUIPA, when a prison substantially burdens an inmate's exercise of religion, the prison must demonstrate that imposing the burden serves a compelling government interest and does so by the least restrictive means." Id. at 182. Therefore, "[w]ith respect to Lovelace's claim against the warden," the Court stated that "the thrust of [its] remand simply requires Keen Mountain to make that demonstration"; the Court emphasized that "any substantive explanation offer by the prison must be viewed with due deference. . . ." Id. The Court further stated that it was "instruct[ing] the District Court to do what RLUIPA commands: assess with due deference any explanation by the prison as to why denying an inmate who breaches the fast the opportunity to participate in other religious

7

observances is the least restrictive way to deal with a compelling problem." Id. at 192.

The Court also remanded for further consideration of plaintiff's constitutional claims under the Free Exercise and Due Process Clauses. Regarding plaintiff's free exercise claim, the Court found that this court had not examined the claim applying the factors set out in Turner v. Safley, 482 U.S. 78, 89-92 (1987).[6] Lovelace, 472 F.3d at 200. Specifically finding that this court had not addressed "Lovelace's claim against [then-Warden] Lee for issuing the policy in his official capacity as Warden of Keen Mountain," the Court vacated summary judgment in favor of then-Warden "Lee in his official capacity on the free exercise claim insofar as Lovelace seeks declaratory and injunctive relief." Id. Regarding plaintiff's due process claim, the Court stated that this court had "failed to address Lovelace's due process claim" and remanded "for further proceedings on the due process claim against Lee in his official capacity." Id. at 202. The Court directed this court to evaluate "whether Lovelace has a liberty interest in Ramadan observance that is protected by the Due Process Clause" and "if so, whether the prison's post-deprivation grievance process, which lasted nearly two months and ended one month after Ramadan, was unconstitutional in its failure to guard against erroneous deprivations and arbitrary decisionmaking." Id. at 203 (citation omitted).

---

[6] The Turner test asks: (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns." Turner, 482 U.S. at 89-92 (internal quotation marks and citations omitted).

8

## II. Summary Judgment

### A. Standard of Review

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. Upon motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962). Rule 56(c) mandates entry of summary judgment against a party who "after adequate time for discovery and upon motion . . . fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex v. Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if reasonable jurors could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict in his favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986). When a motion for summary judgment is made and properly supported by affidavits, depositions, or answers to interrogatories, the non-moving party may not rest on the mere allegations or denials of the pleadings. Rule 56(e). Instead, the non-moving party must respond by affidavits or otherwise and present specific facts from which a jury could reasonably find for either side. Anderson, 477 U.S. at at 256-57.

### B. Warden Bassett's Motion for Summary Judgment

With her motion, Warden Bassett has submitted her own affidavit and the affidavit of Gloria Robinson, Ombudsman Manager for VDOC. Currently,

> [d]uring Ramadan, Keen Mountain utilizes both of the institution's two dining halls, one for the Nation of Islam inmates and the other for the World Community of Islam inmates. The Ramadan morning meal is held from 5:00 a.m. to 5:50 a.m., before

9

sunrise. The evening meal is held from 6:00 p.m. to approximately 7:45 p.m. (this time may very as a result of sunset and daylight savings time). The number of participants who choose to participate in the Ramadan fast varies from year to year. . . . This past Ramadan season we had 136 participants. Due to the large number of participants, and because we have a limited number of staff working during these hours (approximately 36 security officers), it takes about 15 minutes to get the inmates from the housing units and secured in the dining halls. Typically at the beginning of the evening meal, the sun has not completely set so the inmates use this time to have a small group prayer service. Once it is dark, they observe the meal and then return to their housing units.

Warden Bassett points out that "[t]he hundreds of prisoners who do not choose to participate in the Ramadan fast must also be given their meals in the dining halls" at the normal times of 6:30 a.m. and 3:30 p.m.

The policy existing at KMCC in 2002 provided that prisoners who had signed up to participate in the Ramadan program were allowed to take a morning meal before sunrise and an evening meal after sunset, thus allowing them to satisfy the Ramadan fasting requirement. Also as part of the Ramadan observance, inmates were allowed to participate in group prayer services at both of these mealtimes. One component of the prison policy was a provision that directed a prisoner's removal from the Ramadan program if he was observed breaking the Ramadan fast by taking meals from the "regular diet line" at the regular mealtimes.

Warden Bassett explains that, in 2002, NOI inmates' regular weekly religious services were held on Fridays between the hours of 6:30 p.m. and 8:00 p.m. During the 2002 Ramadan observance period, however, the regular services were canceled because the timing conflicted with the evening meal, and the facility had insufficient staff to accommodate continuation of the weekly service during Ramadan. According to Warden Bassett, this conflict has now been resolved by changing the time when NOI inmates observe their weekly religious services. Presently, the weekly NOI

10

"Jumu'ah" prayer is scheduled for Fridays from 1:00 p.m. to 2:30 p.m.[7]

According to Warden Bassett, the policy in effect in 2002 placed a strain on prison security resources because, during Ramadan, the prison administration had to accommodate five dining periods, rather than the normal three dining periods, and the two extra meals had to be delivered during periods of darkness.[8] Warden Bassett states that "[d]arkness provides an inmate perhaps the maximum opportunity for criminal conduct such as an escape attempt, an assault on other inmates or staff, and dropping off or picking up contraband around the prison yard" and that "[t]he strain on security is simply greater than during daylight hours." The Warden was faced with the options of hiring additional security officers for the exclusive purpose of providing security during the Ramadan mealtimes or of diverting security officers from other responsibilities to provide security as the NOI inmates traveled to and from the dining halls, in addition to monitoring inmates during the time they spent having their pre-sunrise and post-sunset meals.

Evidently the Warden found these options untenable. Instead, the Warden has scheduled the weekly prayer services so that they no longer conflict with the pre-dawn and post-sunset breakfast and dinner mealtimes; therefore, the weekly services are no longer canceled during the month-long Ramadan observance period. In Warden Bassett's view, this satisfies the Court of Appeals' concern that NOI inmates who were removed from the pass list had no other religious exercise opportunities available to them. Additionally, the Warden points out that there is a video viewing of NOI religious

---

[7] In 2003, the policy was changed so that weekly services were held on Mondays from 12:30 p.m. to 2:00 p.m. In 2005, the policy was again changed, so that weekly services were scheduled for Fridays from 12:30 p.m. to 2:00 p.m.

[8] In her affidavit, the Warden explains at length the security staff arrangements required to administer meals. She points out that, regarding evening meals, officers also assist other programs and activities that are held at night, such as evening college classes, access to the law library, recreation, and Thursday evening Protestant religious services.

11

services, presently held on Tuesdays from 10:00 a.m. to 11:15 a.m., and that these viewings provide further opportunities for Muslim inmates to observe religious activities in addition to the scheduled Ramadan mealtime group prayer.[9]

Warden Bassett contends that security concerns countervail against permitting NOI inmates to participate in the Ramadan mealtime group prayer if they elect not to participate in the fasting component of Ramadan or are otherwise removed from the pass list.[10] According to the Warden,

> [t]he number one concern for Keen Mountain staff is security. Keen Mountain is a Security Level IV maximum security prison with capacity for 922 inmates (daily average around 902). The inmates housed at this facility range from those who have committed nonviolent crimes such as forgery to inmates with 100+ years and multiple life sentences for capital murders. Inmates are limited in their movement because of the security risk. In addition, Keen Mountain maintains the [VDOC] Protective Custody Unit. This unit is reserved for inmates who have been targets for sexual predators, been employed in the law enforcement or corrections fields or for some other reason their life may be in danger if they were to be housed in general population. These inmates are housed separately from the general population inmates due to various security concerns. This group is isolated and cannot have any contact with general population or special housing inmates.

The Warden asserts that security concerns do not permit inmates who have participated in the mealtime prayer services to then remain in the dining hall, unoccupied, while the other inmates take their meals.[11] Security concerns dictate that prisoners engaging in the mealtime prayer service

---

[9] The Warden states that the video screening of NOI services was added in October 2005.

[10] The Warden notes:

There is no suggestion on the record that Lovelace ever wanted to participate in one component of the Ramadan program, but not the other. In other words, Lovelace wanted to receive his meals before sunrise and after sunset, while also being able to be a part of the prayer services held in connection with those meals. He would not appear to have standing to assert the claim of a hypothetical prisoner who wants to do one, but not the other.

[11] Warden Bassett explains:

Having inmates in the dining hall who are not actively engaged in an activity simply gives them

12

only, but not taking the meal, would need to be escorted back to their housing units while the other inmates remain behind to eat the meal, thus placing more demands on the security staff, who must escort the non-fasting participants back to their cells while also monitoring the pre-sunrise and post-sunset diners. In sum, the Warden contends that the current policy eliminates these concerns while allowing inmates, whether or not they participate in the Ramadan program at all, to participate in weekly Jumu'ah prayer services and video viewing of NOI services.[12]

Regarding the prison's "one-strike" policy of removing inmates from the Ramadan pass list if they are observed breaking the fast, Warden Bassett avers that financial and security concerns make this aspect of the policy a necessary component of the Ramadan meal program. She asserts that inmates would likely take additional meals if there were no consequences to a Ramadan participant eating at regular mealtimes in the regular diet line.[13] And, if the prison were to change the one-strike policy to a two-, three-, or more-strikes policy, Warden Bassett anticipates that the

_____

an unnecessary opportunity to find misconduct in which to engage. For example, the raw materials for the making of what is known as mash (an alcoholic concoction that is strictly forbidden) are in the kitchen. Inmates are known to concoct clever ways to get these raw materials from the kitchen area back to their housing units where they can then make mash. We do not want prisoners sitting around the dining hall with nothing to do, figuring out how they can get their hands on the nearby raw materials and then get the materials back to the housing units. So we would experience an unscheduled exit break, while security officers supervised an additional movement of prisoners between the dining halls and the housing units, thus further stretching our ability to provide optimal security for the facility as a whole.

[12] The Warden adds that "several changes have been made to the Food Service Manual for Ramadan this year," that "[t]here will be special menus for the Ramadan participants," that "calories at the morning and evening meals will be greater to accommodate for the missed meal during the day," and that "Ramadan participants will be provided with a bag snack for the evening hours." Additionally, "Ramadan participants will be able to attend the Eid Ul Fitr Prayer and meal within 3 days after the conclusion of Ramadan and the Eid Ul Adha Prayer service approximately 4 months after Ramadan."

[13] The Warden states that "prisoners generally have a strong proclivity to see just how far they can go in breaking the daily prison routine without suffering an adverse consequence," and points out that "expenses will be increased if the facility experiences many prisoners taking advantage of a relaxed Ramadan meal policy to get extra meals."

13

unwieldy record-keeping required to enforce such a policy would eventually lead to an "unlimited" strikes policy, and that "[a]ttention will be diverted from the primary task of providing institutional security to keeping tabs on how many strikes a participant has."[14] The Warden asserts that the one-strike policy ensures that only those inmates with a legitimate interest in observing the Ramadan program will sign up, and it provides the prison with a mechanism to gauge the sincerity of an inmate's religious need to participate in the fasting program, given that his breaking of the fast provides "some indication" that his signing up for the program was not motivated by sincere religious beliefs.[15]

Warden Bassett contends that KMCC has implemented an improved identification system. If a prison staffer believes that an inmate has broken the fast by eating in the regular diet line, the officer is required to approach the inmate and ask for that inmate's identification card, thus verifying the inmate's identity on the spot, rather than simply reporting that he or she saw an inmate breaking the Ramadan fast. The new policy allows the prison staffer to write up a report only after verifying the inmate's identity and checking that verified identity against the names on the Ramadan pass list.[16]

---

[14] In her affidavit, Warden Bassett states that, were KMCC to identify "prisoners who wanted to do one but not the other component of Ramadan, then we would need to create additional pass lists to identify those prisoners." She adds:

> The existence of multiple pass lists immediately creates more potential for confusion in trying to keep track of which inmates fall into which category. We already have to keep two pass lists, one for the Nation of Islam inmates and one for the World Community of Islam inmates. The task of tracking the prisoners is difficult enough already, without creating potential for more confusion.

[15] The Warden emphasizes that "prisoners who sign up for the Ramadan fast receive clear notice that ["one-strike"] is the rule." She adds: "We cannot count on the good graces of the prisoner population to insure that only the truly sincere religious person participates in Ramadan, or even that prisoners with sincere religious beliefs will not work at testing the extent to which they can get away with something."

[16] In the Warden's view, this addresses the situation that resulted in "the failure to correct the wrong identification made of Lovelace."

14

The Ombudsman Manager's affidavit indicates that the revised identification procedure was implemented at KMCC to address the possibility that the lapse of time involved in a prisoner availing himself of the grievance procedure in order to correct a misidentification could cause a compliant inmate to wholly miss out on the opportunity to participate in a program of religious accommodation.

Addressing the RLUIPA issues on remand, the Warden contends that "VDOC has a compelling interest in having a mechanism in place that conditions participation in the religious accommodation diet on a participant's steadfast adherence to the religious exercise. . . ." She posits that, considering the "substantial number of prisoners who apply for admission to the Ramadan diet," the "number could be expected to rise dramatically if there is no provision for a prisoner's removal . . . other than his own voluntary withdrawal." She stresses that "the dietary program already strains the prison's ability to provide security" and that "[h]aving a process in place that allows the inmate population to pick and choose [among] the five daily meals provided during Ramadan . . . would simply prove unworkable." In addition to the "tax" on prison security capacities, she anticipates that such a program would "increase . . . the cost of providing the meals if prisoners figure out they can get up to five meals a day." She argues further that "[t]he removal policy . . . is narrowly tailored" because "[i]t reaches only those prisoners who have broken the fast" and that "[t]here really is no less restrictive means to secure the prison's interests in operational security and efficiency. . . ."

Regarding the free exercise question, the Warden, citing the factors laid out in Turner, 482 U.S. at 89-92, argues that there is a rational connection between the policy and the government interest in security and operational efficiency and that the provision of Jumu'ah prayers and video screening of NOI services during Ramadan provide an inmate alternative means to exercise his

15

religious beliefs.  Additionally, she contends there "simply are not any obvious, easy alternatives to the policy" and that an accommodation that allows inmates who break the fast to nonetheless remain on the dietary program would have an adverse impact on security staff and the allocation of prison resources.

Turning to the issue of due process, the Warden argues that the existing grievance procedure is clearly adequate; that the risk of erroneous deprivation is lessened by the new identification policy; and that, but for the failure to verify plaintiff's identification, the existing grievance procedure provided an adequate mechanism for the resolution of plaintiff's issue.  In the Warden's view, the only way the grievance procedure might have operated so as to prevent the incorrect identification at issue here would have been to require Officer Lester to seek plaintiff out and verify his identification; however, she notes that even an identification procedure such as the one presently implemented will not prevent an intentional misidentification.[17]  She emphasizes that the VDOC "needs a unitary grievance process, and not a myriad of processes that try to anticipate different circumstances," and that "[i]t is simply not possible for the VDOC to have a grievance procedure that anticipates each and every range of issues that may come to pass within a particular prison."

### C.  Plaintiff's Response to Warden Bassett's Motion for Summary Judgment

Plaintiff responds that "most of the testimony presented in Bassett's affidavit is untrue, misleading, or otherwise fails to accurately reflect the realities on the ground at KMCC."  He argues that the "totals [of Ramadan participants presented by Warden Bassett] reflect the **initial** number of

---

[17] The Ombudsman Manager, in her affidavit, states that, "within the context of the existing grievance procedure," "[l]ocal officials certainly could have" a) reviewed tape from the surveillance camera to confirm whether plaintiff took a meal in the regular lunch line or b) could have required the officer who wrongly identified plaintiff to view him in person sooner, "presumably resulting in a corrected identification before Ramadan ended."

16

participants . . . and included participants who were in protective custody and special housing segregation, all of whom observed Ramadan while confined to their cells." He adds that "the attrition rate among . . . participants . . . through inmate apathy, staff removals, etc. generally tops 40 percent." He provides the numbers of participants in 2005, broken down by NOI and World Community classification and the numbers of those participants in the general population, and concludes that "the actual number of . . . Ramadan participants that the prison must accommodate on any given night rarely exceeds 10-15 NOI and 20-25 World Community participants – not 176 participants as Bassett contends."

Plaintiff contends that Warden Bassett "neglects to mention that no Ramadan participant goes to the dining halls for the predawn meal; those meals, for the past 4 years, were delivered to the participants' cells, and the inmate was not permitted to exit his cell." Plaintiff submits an exhibit, a "Ramadan Master Pass List" for October 5, 2005, to November 2, 2005, in support of this statement. Thus, he argues, "the Ramadan participants require no security staff to oversee movement for the predawn meal." He also argues that Warden Bassett's assertions regarding security staff requirements for the service of evening meals is "highly misleading" because such staff is "**not** on station to accommodate Ramadan participants" but are "on station year-round." He contends that Warden Bassett's statements regarding the opening and closing of chow halls doors are inaccurate because "[t]he chow hall doors are locked and unlocked electronically from a remote location." In his view, "Bassett's contention that significant security staff are allocated to accommodate great numbers of Ramadan participants[] is false. The reality is that the handful of Ramadan participants require no security staff for the morning meals and are accommodated by existing, routine security for the evening meals."

17

Regarding Warden Bassett's statements that "prisoners moving to the dining halls . . . under the cover of darkness only exacerbates our security concerns," plaintiff describes them as "specious hyperbole," repeating that "Ramadan participants do not attend the dining halls for their morning meals" and adding that "prison floodlights transform night into day within the prison compound." In plaintiff's view, "[t]here simply in [sic] no cover of darkness." He contends that, "during the period of early morning darkness, the prison conducts mass movement, year-round, of inmates," and goes into some details regarding the distribution in the early morning hours of inmate kitchen workers, protective custody inmates, and Common-Fare diet[18] inmates; he notes that, "[d]uring Winter months and prior to daylight savings time, the sky is still dark at 7:00 a.m." He further contends that "there is no cover of darkness for the Ramdan [sic] participants after the evening meal," asserting that, over the next twelve years, "Ramadan will occur between June and September," and that evening meals in those future years will be held in daylight if they are served, as they currently are, from 6:00 p.m. until approximately 7:40 p.m. He adds that "the 7:45 time set by Bassett for the Ramadan participants to return to their housing units is not arbitrary," because "all the other evening . . . activities conclude" at that time.

Regarding Warden Bassett's assertion that security is the primary concern for KMCC staff, plaintiff argues that "KMCC Ramadan participants are subjected to an egregious lack of security when they gather in the chow halls for the evening Ramadan meal." He states that, once "Ramadan participants enter the dining halls for the evening meal, the passlist officer secures the dining hall doors and then departs, leaving the Muslims wholly unattended." By comparison, plaintiff asserts,

---

[18] Common Fare is a kosher diet designed to accommodate the dietary needs of a wide variety of religious groups.

18

"KMCC deploys extraordinary security when serving the 3 regularly scheduled meals to the general population prisoners." Plaintiff describes Warden Bassett's statement that a kitchen officer monitors the service as "false," pointing to an informal request form he submitted in March, in reply to which Major Newberry replied that "there are no officers in the chow hall during your services," that "the officer is posted in the hallways" and "at the serving line when feeding is taking place," and that "[y]ou may get the officers [sic] attention and he can come to the door or window and speak with you if you need assistance." In plaintiff's view, "the dining halls are, for the Muslims during Ramadan, the least secure (and potentially most dangerous) location at KMCC," and "[t]here simply is no merit to defendants' contention that to accommodate the Ramadan participants creates a strain on security resources."

Turning to Warden Bassett's treatment of "the question of whether the prison could accommodate prisoners who want only to participate in the fast, and prisoners who want only to participate in the group prayer service which occurs during the Ramadan mealtime," plaintiff asserts that the "question misses the mark." He concedes that "few sincere Muslim prisoners would choose to abandon the Ramadan fast, only to then insist upon group prayers along side [sic] other fast participants." In plaintiff's view, however, "the relevant question is whether a sincere Muslim prisoner who wants to participate **both** in the Ramadan fast and the attendant group prayers, [sic] should be deprived of both the fast and the prayer when prison officials bar . . . the prisoner from the Ramadan fast only." Plaintiff contends that Warden Bassett's argument against multiple passlists is invalid because an extra check-box on the existing passlist is all that is required, not additional passlists. He claims that Warden Bassett's contention against having unoccupied inmates in the dining hall while other inmates are dining "crumbles under scrutiny" because, in his view, under the

19

proposed accommodation, "all Ramadan participants "have the same opportunity . . . to contemplate any mischief." He adds that, at approximately 7:00 p.m. every evening, the security staff conducts a "scheduled 'Gate Break' where inmates outside their housing units for evening activities may return to their housing units" and "those inmates who wish to exit the housing units may at the same time move to outside activities." In plaintiff's view, because "hundreds of prisoners" move about the prison at a regularly scheduled time, an extra move is justified to allow prisoners who are not participating in the Ramadan fast to attend evening prayers. He adds that Warden Bassett "has assured [him] that during future Ramadans a security officer will be posted inside the dining hall with the fast participants" and that the "officer will be able easily to unlock the dining hall doors to permit the handful of pray-only inmates to join the throng of prisoners already moving."

Regarding Warden Bassett's assertion that KMCC now provides additional opportunities for group religious activities during Ramadan, plaintiff concedes that the Warden "is correct in these representations"; however, he argues that "Bassett errs" in her suggestion that these activities "provide adequate opportunity for a Muslim to practice his faith when he is denied the Ramadan observance." He describes Ramadan as "one of the five pillars of Islam," "a sacred period of overarching spiritual significance," and as a time when "the Muslim immerses himself in prayer, and strives to manifest the discipline required to abstain from food, sex, and other corporeal desires." He states that "[c]amaraderie among the Muslim [sic] is an important element of the Ramadan observance where God has revealed to the Muslims that congregational prayers carry 70 times the reward of solitary individual prayer." In plaintiff's view, the "daily evening meal-time" is the only opportunity KMCC provides

for the Muslim prisoner to pray congregationally and perform other activities such

20

as communal reading of the Holy Quran and group teaching and discussion of
religious principles. Thus, the almost 50 hours of congregational prayer and
communal interaction the participant may enjoy during 30 days of Ramadan cannot
be compensated by a weekly 1 1/2 hour prayer service and hour-long video. Indeed,
if such weekly prayer and video viewing were adequate substitution for the Ramadan
observances, Ramadan might then be unnecessary.

Furthermore, plaintiff contends, a maximum of fourteen inmates may attend the video screening,

owing to the size of the room where the video is currently viewed.[19]

Regarding the prison's one-strike policy, plaintiff argues that a policy imposing any strike

at all is an unconstitutional infringement on his religious beliefs and that "prison officials have no

compelling interest in barring any prisoner from the Ramadan observance based upon the prisoner's

having violated a rule of Ramadan." He analogizes the policy to that of a diabetic inmate on a

medically appropriate diet. In plaintiff's view, were such an inmate caught purchasing a candy bar

from the commissary, "the prison would not be justified in removing the inmate from his medical

diet and forcing him to eat a high-sugar diet for the violation – even where prison officials deemed

the purchase of the candy bar to be an indication that the inmate was insincere about properly

controlling his diabetes." He adds that a policy of no strikes at all is "perfectly viable" because

"[t]he prison disciplinary procedure is fully capable of addressing any number of Ramadan

violations. . . ." According to plaintiff, "to the extent that a prisoner demonstrates religious

insincerity by violating the tenets of Ramadan, the threat of disciplinary action is, to the insincere

participant, a greater deterrent . . . than is removal from the Ramadan observance where, presumably,

---

[19] Despite his earlier assertions regarding the degree of attrition in the Ramadan program and the actual
small numbers of participants, plaintiff complains that, given the size of the video room, "even where the 14
inmates each week are substituted for a different 14 inmates the following week, a maximum of just 56 inmates
will have approximately one (1) hour during the month of Ramadan to view videos" and that, when "more than
56 inmates observe Ramadan, some of them necessarily receive no video time." The court notes that this
hypothetical situation is not at issue.

21

the insincere participant cares little about the observance." Plaintiff posits that "utilization of the prison disciplinary procedures would provide to the barred participant the panoply of due process protections attendant to that procedure."

Regarding the Warden's affirmation that KMCC "has implemented a better identification system to be used if staff feels an inmate who is limited to the Ramadan mealtimes is nonetheless eating from the regular meals lines," and that, "in the future, if either security or food services staff observes someone whom they believe to be a Ramadan participant eating a regular meal, the staff member will be required to approach the inmate and ask for the inmate's identification (ID) card for verification of who the inmate is" before the "staff member will prepare [an] incident report," plaintiff alleges that the Warden "has presented to this Court no evidence that such a policy, in fact, exists." Plaintiff states that "prison staff have not posted or otherwise promulgated any memorandum or notice of any such new system" and that the Warden has not "revised any of the prison's Operating Procedures to reflect such change." He adds that he has been unable to find "any security officers who are aware that the facility has implemented any such identification system." He cites "the prison's Chief of Security, Major E. Newberry," as allegedly contradicting "Bassett's [affidavit] testimony that such policy has been implemented."[20] Thus, according to plaintiff, "Bassett's [affidavit] testimony regarding a better identification is not credible."[21, 22]

---

[20]In support of this assertion, he presents an "Informal Request Form," dated May 7, 2007, wherein an inmate identified as "M. Couch" inquired of Mr. Newberry, "[I]s there any policy at KMCC that requires an officer who observes an inmate violating a prison rule, such as taking 2 lunch trays, to view the inmates [sic] identification card before the officer writes an incident report?" On May 8, 2007, Mr. Newberry replied: "Mr. Couch, an officer has to be able to positively identify an inmate before writing a charge. It is not mandatory that an I.D. card be checked. Some staff are able to identify an inmate visually if they are already familiar with who the inmate is."

[21] Plaintiff alleges that "[t]he ability to adduce evidence at a disciplinary hearing or at a predeprivation hearing, such as security video tapes or a face-to-face with Lester, undoubtedly would have resolved the matter

22

Turning to the VDOC Ombudsman Manager's affidavit, plaintiff contends that "any grievance procedure which requires up to 7 months to address a prisoner's complaint that he is being improperly barred from the 30-day Ramadan observance," yet "is unable even to correctly identify an inmate who persistently sought to be correctly identified, cannot then be characterized as a process that provides 'quick and considered answers' to an inmate's complaint." As to the Ombudsman Manager's "reasons why the VDOC cannot be expected to establish different issue resolution procedures" for complaints regarding religious accommodation, plaintiff states that, "to the extent that a new policy or procedure may befuddle prison staff, the advent of such policy must be viewed as an ordinary incident of VDOC employment." Plaintiff then goes on to propose "enhanced due process" protections that should be given to Ramadan participants, including a "formal hearing" before an inmate may be removed from the observance. Plaintiff alleges that such predeprivation hearings are required before an inmate may be removed from the Common Fare diet.[23]

---

of any innocent misidentification of [plaintiff]," but he acknowledges that no "policy could have prevented [Officer] Lester from acting maliciously."

[22] Turning to Bassett's statements regarding changes that "have been made to the Food Service Manual for Ramadan this year," plaintiff dismisses the changes as "an apparent attempt to highlight prison officials' goodwill toward the Muslim prisoners," and he characterizes that "goodwill" as "patently false." Plaintiff raises the brand-new complaint, not at issue in this case, that "[d]efendants have for years subjected Ramadan participants to an egregiously calorically [sic] and nutritionally inadequate diet."

[23] Plaintiff also proposes that a Ramadan participant should have access to the emergency grievance procedure because "when a Muslim is deprived of the Ramadan observance, each day of deprivation constitutes an irreparable harm." He further argues that, "to the extent that prisoners may attempt to frame a non-emergency as an emergency . . . KMCC staff is particularly adept at identifying those circumstances." He points to the denial of his emergency grievances following his removal from the pass list in November 2002 and asserts that, "if KMCC staff were to allow such complaints . . . to proceed as emergencies, staff would find no difficulty in discerning that dissimilar complaints may be non-emergencies." Plaintiff does not allege or submit any evidence showing that removal from the Common Fare diet qualifies as an emergency grievance issue.

23

### D. Analysis

### 1. RLUIPA

RLUIPA provides that "[n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution," unless the burden furthers "a compelling governmental interest," and does so by the "least restrictive means." 42 U.S.C. § 2000cc-1(a). Although the plaintiff bears the initial burden of establishing that the government's actions substantially burdened his exercise of religion, once such a showing is made, the government bears the burden of persuasion that its practice is in furtherance of a compelling governmental interest and is the least restrictive means of furthering that interest. Adkins v. Kaspar, 393 F.3d 559, 567 n. 32 (5th Cir. 2004), cert. denied, 545 U.S. 1104 (2005); Civil Liberties for Urban Believers v. Chicago, 342 F.3d 752, 760 (7th Cir. 2003), cert. denied, 541 U.S. 1096 (2004).

In the instant case, the Court of Appeals observed that Congress, enacting RLUIPA, "'intended to provide as much protection as possible to prisoners' religious rights' without overly encumbering prison operations." Lovelace, 472 F.3d at 186 (citing Murphy v. Mo. Dep't of Corr., 372 F.3d 979, 987 (8th Cir. 2004); Cutter v. Wilkinson, 544 U.S. 709, 723 (2005) (noting that lawmakers supporting RLUIPA "anticipated that courts would apply the Act's standard with due deference to the experience and expertise of prison and jail administrators")). After finding that "[s]ection 3 of RLUIPA . . . . applies to Keen Mountain and to the defendants who are state officials or actors employed there," id. (citing 42 U.S.C. § 2000cc-1(b)(1); Madison v. Riter, 355 F.3d 310, 314 (4th Cir. 2003) (noting that VDOC received $4.72 million from the federal government in 2002)), the Court considered whether plaintiff's "inability to observe Ramadan for twenty-four of its thirty days – specifically, his inability to fast during daylight hours and to attend NOI

24

congregational prayers and services – imposed a substantial burden on his religious exercise," id. at

187.

　　As an initial matter, the Court of Appeals found that plaintiff's "observance of Ramadan

qualifies as 'religious exercise'" under RLUIPA, 42 U.S.C. § 2000cc-5(7)(A). Lovelace, 472 F.3d

at 187. Next, the Court considered "whether the burden was substantial." Id. Hewing to the

Supreme Court's definition of "substantial burden" as one that "put[s] substantial pressure on an

adherent to modify his behavior and to violate his beliefs," Thomas v. Review Bd. of Ind.

Employment Sec. Div., 450 U.S. 707, 718 (1981), the Court of Appeals found that plaintiff's

"removal from the Ramadan observance pass list at Keen Mountain qualifies as a substantial burden

under RLUIPA," Lovelace, 472 F.3d at 187. The Court observed:

> Once removed from the pass list, Lovelace was excluded from special (pre-dawn,
> post-sunset) Ramadan meals and therefore could not fast during daylight hours.
> Unable to fast, he could not fulfill one of the five pillars or obligations of Islam.
> **Moreover . . . he could not participate in NOI group prayers or services held in
> the dining hall before or after the special breakfast meal. This deprivation is
> critical because prior to Ramadan the prison accommodated NOI inmates by
> allowing them to attend weekly NOI services. These services were cancelled
> during Ramadan when the policy was in effect.** Thus . . . the policy works to
> restrict the religious exercise of any NOI inmate who cannot or does not fast, but who
> still wishes to participate in group services or prayers.

Id. at 187-88 (emphasis added).

　　The Court pointed out that, "once an inmate is removed from participation in the Ramadan

fast under the policy, the policy automatically bars him from participation in congregational religious

exercises, **such as NOI services and group prayers**." Id. at 188 (emphasis added). Recognizing

"that 'prison officials may appropriately question whether a prisoner's religiosity, asserted as a basis

for a requested accommodation [here, pre-dawn and post-sunset meals to allow daytime fasting], is

25

authentic," id. (citing Cutter, 544 U.S. at 725 n. 13), the Court expressed concern that the Ramadan fast removal policy's "blanket assumption," id., "triggered [plaintiff's] wholesale exclusion from group religious observances and exercises," id. at 189. The Court emphasized that

> **during Ramadan the prison cancelled regular NOI services and precluded other gatherings for group prayer**. Thus, as Lovelace spells out in his own words: when he was removed from the pass list, "he was effectively prohibited from exercising his religious beliefs because he was not permitted to fast, not permitted to attend NOI religious services, not permitted to attend Friday [Jumu'ah] services, and not permitted to participate in group prayers." **The policy was therefore arranged and written so that disqualification from participation in one religious exercise (the fast) meant that normal avenues for communal worship (group services and prayers) at the prison became unavailable automatically**.

Id. at 189 (internal citations omitted) (emphasis added). It was "**this broad disqualification aspect of the policy**" that substantially burdened plaintiff's RLUIPA right to religious exercise. Id. (emphasis added).

Having found that the "**broad disqualification aspect** of the policy" substantially burdened plaintiff's RLUIPA right to religious exercise, the Court observed, however, "[t]hat does not end the RLUIPA analysis. . . ." Id. "[B]ecause the policy's burdens or restrictions could be justified by compelling considerations of security or good order," the Court stated, "[t]he prison will therefore have the opportunity to present its rationale on remand. . . ." Id. The Court observed that the burden therefore shifted "to the defendants to show that the Ramadan policy's strict (and broad) removal provision is the least restrictive means of furthering a compelling governmental interest," and further explained that

> "'Context matters'" in applying this "compelling governmental interest" standard. Cutter, 544 U.S. at 723 (quoting Grutter v. Bollinger, 539 U.S. 306, 327 (2003)). Courts should apply this standard with "**due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security and discipline, consistent with**

26

**consideration of costs and limited resources.**" Id. at 723 (quoting joint statement of Sen. Hatch and Sen. Kennedy, RLUIPA's co-sponsors); see also Murphy, 372 F.3d at 987-88 (discussing legislative history). Of these enumerated concerns, **security deserves "particular sensitivity."** Cutter, 544 U.S. at 722. RLUIPA, in other words, is not meant to "elevate accommodation of religious observances over an institution's **need to maintain order and safety.**" Id.

472 F.3d at 189-90 (parallel citations omitted; emphasis added). The Court stated that its "approach underscores that [the] judgments [of prison administrators] must . . . be viewed through the lens of due deference," adding that "the first job is to require Keen Mountain to take the unremarkable step of providing an explanation for the policy's restrictions that takes into account any institutional need to maintain good order, security, and discipline or to control costs" and that such "explanation, when it comes, will be afforded due deference." Id. at 190.

Based on the Warden's motion for summary judgment and the affidavits submitted in support thereof, I am convinced that compelling governmental interests justify the prison policy's condition that a participant must adhere to the fast in order to continue to receive the accommodated Ramadan diet. The Warden cites the total number of prisoners supervised, clothed, fed, protected, and otherwise attended to at KMCC[24]; the various security requirements of all of KMCC's prisoners, guards, staffers, and administrators; the number of prisoners who apply for the diet under its present conditions; the number of prisoners who would likely participate in Ramadan were there simply an "open admissions" policy in place, which could allow a participant to take as many as five meals a day during Ramadan, and the attendant costs of supplying those five meals to an essentially unlimited and unpredictable number of inmates and the security required to supervise the delivery of those meals; and the logistics and security concerns of providing pre-sunrise and post-sunset

---

[24] As I have already observed, KMCC is a **maximum security** prison, with a capacity for 922 inmates, housing a daily average of 902 inmates.

27

meals to Ramadan participants, and the need to maintain order in delivering all meals and in managing the movement of inmates about the prison.[25]

I find that the Warden has sufficiently "advanced" the following "justifications for the policy's burdens on religious exercise," "verified by [the statements the Warden has now] placed into the summary judgment record":  the "number of inmates" supervised at KMCC, the "budgetary restrictions" beneath which the Warden labors, the "staffing problems" she encounters, the "security risks [KMCC faces] in controlling the prison dining rooms and releasing inmates from their cells before dawn and after dark." Lovelace, 472 F.3d at 190.   The Warden has presented two affidavits offering "a thorough official explanation of the penological rationales for the policy." Id. at 191. The Warden has met RLUIPA's required showing of a "compelling interest" in the form of sworn statements from the Warden and VDOC's Ombudsman Manager, discussing "security, safety, [and] cost consideration[s] that justif[y] the restrictions in the Ramadan policy." Id. Thus, the Warden has addressed "the fundamental problem presented" to the Court of Appeals and has explained "why the prison had a compelling basis for eliminating a prisoner's access to established congregational services because of an asserted failure to observe the fast." Id.

I turn now to the remaining issue regarding the application of RLUIPA.  The Court of Appeals stated:

---

[25] Plaintiff disputes the Warden's averments regarding security requirements. Plaintiff states that prisoners take their pre-sunrise meals in their cells, not in a dining hall, as the Warden suggests.  The evidence plaintiff submits in support of this assertion is from the 2005 Ramadan period.  Regardless of whether Ramadan fast participants take their pre-sunrise meals in their cells or in a dining hall, the meals must be delivered to them, which requires a dispensation of security measures and personnel.  Additionally, plaintiff's lengthy specific assertions – about the regular movement of inmates, for various reasons, under cover of darkness; about prison floodlights eliminating the darkness; about the number of armed guards stationed on catwalks and in dining halls, etc., and dispatched to remote locations to open various doors and gates – **serve to underscore, rather than diminish, the Warden's statements regarding security concerns.**

28

Even if we assume that the asserted governmental interest is compelling, the defendants have not shown that the policy, more precisely its removal provision, is the least restrictive means of furthering this interest. The removal provision is far reaching in that it excludes inmates not only from the special Ramadan meals but also from the Ramadan prayer services held in the dining hall immediately before or after the morning meal. An NOI inmate, such as Lovelace, had no other options for congregational worship. Regular NOI Friday services were cancelled by the prison during Ramadan. Moreover, Lovelace could not attend any related Muslim services as a substitute for NOI services during the thirty-day span. The prison prohibits inmates from attending more than one religious group's services in a calendar quarter. Because Lovelace had signed up for NOI services, he could not attend Friday Jumu'ah (Muslim) services as an alternative to the daily NOI prayers. **To the extent that the removal provision prohibits both special meal and group prayer access, the prison Ramadan policy is arguably not the least restrictive means** of furthering the asserted governmental interest. Thus, at this stage, the defendants have not demonstrated that the prison policy satisfies the strict requirements of RLUIPA

Id. at 191-92 (emphasis added).

I agree that KMCC's former removal policy, which excluded a Ramadan pass list participant who broke the daylight fast from access to any other opportunity for congregational worship, was "arguably not the least restrictive means of furthering" the compelling governmental interest at issue here. Id. at 191. However, the present policy corrects the problem. Currently, a participant who breaks the daylight fast can attend his regular weekly NOI services, because those weekly services are no longer canceled during Ramadan, and are scheduled so as not to be pre-empted by any Ramadan observance. The current policy also provides an additional NOI service in the form of a video screening. These features directly address the Fourth Circuit's concerns about the wholesale exclusion from congregational worship under the former policy. Moreover, the Warden offers justifications and rationales,[26] buttressed by affidavits, in support of KMCC's one-strike policy of denying to inmates who breach the fast continued participation in that fast period's special

---

[26] To recapitulate, these include arguments concerning operational security and efficiency, as well as the argument that alternatives to an exclusion policy would permit purported fast participants to take extra meals.

dispensation of pre-sunrise and post-sunset meals, and any coincidental, contemporaneous congregation at any of those meals.

KMCC's one-strike policy centers on the fair assumption that, if one breaks a religious fast, one is no longer sincere in this aspect of his religious practice, and thus need not be accommodated to allow participation in the fast. The policy as presently instituted does no more than exclude a Ramadan daylight fast-breaker from a religious accommodation that he has, in effect, already rejected. The present policy ensures that the religious dietary accommodation extends only to sincere observers of the fast, yet preserves inmates' other opportunities for religious participation. As the Court of Appeals noted, "RLUIPA does not . . . preclude inquiry into 'the sincerity of a prisoner's professed religiosity.'" Id. at 187 n. 2 (citing Cutter, 544 U.S. at 725 n. 13). "[P]rison officials may appropriately question whether a prisoner's religiosity, asserted as a basis for a requested accommodation [here, pre-dawn and post-sunset meals to allow daytime fasting], is authentic." Cutter, 544 U.S. at 725 n. 13. The present policy acknowledges that "[a]n inmate, however, could decide not to be religious about fasting and still be religious about other practices, such as congregational services or group prayer" and does not substantially burden such an inmate's right to religious exercise because it does not "automatically assume[] that lack of sincerity (or religiosity) with respect to one practice means lack of sincerity with respect to others." Lovelace, 472. F.3d at 188 (citing 42 U.S.C. § 2000cc-5(7)(A) and Reed v. Faulkner, 842 F.2d 960, 963 (7th Cir.1988) (recognizing "the fact that a person [who] does not adhere steadfastly to every tenant of his faith" may still be sincere about participating in some religious practices)); see also Gartrell v. Ashcroft, 191 F. Supp. 2d 23 (D.D.C. 2002) ("[p]rison officials . . . can and do assess the sincerity of inmates' religious beliefs in order to administer prison programs and policies ranging from

requests for exceptions to grooming policies or personal property rules to approval for special meals").

The Warden has explained "in a responsive fashion why the Ramadan policy's burdens on religious exercise are justified under RLUIPA's standard." Lovelace, 472 F.3d at 193. The Warden has met her burden of persuasion and has demonstrated that KMCC's present removal policy is in furtherance of a compelling government interest and is the least restrictive means of furthering that interest. Accordingly, I will grant summary judgment to Warden Bassett on plaintiff's claims under RLUIPA.

### 2. Free Exercise

Regarding plaintiff's Free Exercise claims under 42 U.S.C. § 1983, the Court of Appeals recapitulated plaintiff's contention "that the prison Ramadan policy violated his rights under the Free Exercise Clause" and recited the applicable precedents:

> "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." Turner v. Safley, 482 U.S. 78, 84 (1987) Inmates "clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion." O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987) (citation omitted). Inmates' constitutional rights must be evaluated within the context of their incarceration, however. The Supreme Court has long cautioned that "courts are ill equipped to deal with the increasingly urgent problems of prison administration." Procunier v. Martinez, 416 U.S. 396, 405 (1974). "Running a prison is an inordinately difficult undertaking," and the task is "peculiarly within the province of the legislative and executive branches of government." Turner, 482 U.S. at 84-85. As a consequence, **courts must accord deference to the officials who run a prison, overseeing and coordinating its many aspects, including security, discipline, and general administration**. O'Lone, 482 U.S. at 349-50; Turner, 482 U.S. at 84-85. This deference is achieved in part through application of a **reasonableness test** that is less restrictive than the test ordinarily applied to alleged infringements of fundamental constitutional rights. O'Lone, 482 U.S. at 349. **A prison regulation that abridges inmates' constitutional rights is "valid if it is reasonably related to legitimate penological interests."** Turner, 482 U.S. at 89.

31

472 F.3d at 199-200 (emphasis added; parallel citations omitted). The Court added that "the First Amendment affords **less** protection to inmates' free exercise rights than does RLUIPA." Id. at 200 (citing Freeman v. Texas Dep't of Criminal Justice, 369 F.3d 854, 857-58 n. 1 (5th Cir.2004) (emphasis added)).

The Court further stated that the removal provision "must meet the reasonableness test set forth in Turner," explaining that

> [t]he Turner test asks: (1) whether there is a "valid, rational connection" between the prison regulation or action and the interest asserted by the government, or whether this interest is "so remote as to render the policy arbitrary or irrational"; (2) whether "alternative means of exercising the right . . . remain open to prison inmates," an inquiry that asks broadly whether inmates were deprived of all forms of religious exercise or whether they were able to participate in other observances of their faith; (3) what impact the desired accommodation would have on security staff, inmates, and the allocation of prison resources; and (4) whether there exist any "obvious, easy alternatives" to the challenged regulation or action, which may suggest that it is "not reasonable, but is [instead] an exaggerated response to prison concerns."

Lovelace, 472 F.3d at 200 (citing Turner, 482 U.S. at 89-92 (internal quotation marks and citations omitted)). The Court observed that this court "never examined the Turner factors in granting summary judgment to the defendants," basing

> its decision entirely on the defendants' state of mind, concluding that "no constitutional violation occurred in relation to the free exercise claim as the actions of defendants were negligent rather than intentional." Asking whether the defendants acted with the requisite intent in implementing the policy does not, however, address whether the policy by its own terms violates the Free Exercise Clause. More precisely, it does not address Lovelace's claim against [then-Warden] Lee for issuing the policy in his official capacity as Warden of Keen Mountain.

Id. (internal citations omitted). Therefore, the Court vacated "summary judgment in favor of [then-Warden] Lee in his official capacity on the free exercise claim insofar as Lovelace seeks declaratory and injunctive relief." Id. The Court noted that a remand is

32

appropriate for obvious reasons. First, as already stated, the policy, through its broad restrictions on several forms of religious exercise, creates a substantial burden. Second, **Turner at a minimum requires a deferential examination of the prison's rationale for the restrictions, but the prison has yet to come forward with any substantive rationale**. The prison's rationale for the restrictions and any facts relevant to the <u>Turner</u> factors should be presented to the district court in the first instance. . . . Because we do not have "a proper record for review," Lovelace's free exercise claim will be remanded. <u>See</u> <u>Ross v. Commc'ns Satellite Corp.</u>, 759 F.2d 355, 363-64 (4th Cir. 1985).

<u>Id.</u> n. 9 (citations omitted; emphasis added).

The Warden's summary judgment motion, and its accompanying affidavits, make clear that there is a substantive rationale for the prison's removal policy. In the first instance, I have already remarked that one who breaks a religious daylight fast is no longer sincere about participating in the fast and no longer needs such accommodation.[27] A religious accommodation that allows inmates to break the daylight fast and yet continue taking the pre-sunrise and post-sunset meals would have a detrimental effect on the maintenance of good order and prison discipline, in addition to having an adverse impact upon security staff and the allocation of prison resources. In keeping with the <u>Turner</u> factors, there is a valid, rational connection between the removal policy and the prison's interests in security, operational efficiency, and controlling the costs associated with supplying special diets. The policy in place now, which provides during Ramadan for the continuation of regular congregational opportunities and the opportunity to view videos of NOI services, provides alternative means to exercise a prisoner's religious beliefs. Additionally, there are no obvious, easy alternatives to the prison's one-strike removal policy.[28]

---

[27] Moreover, the Warden has shown that would-be fast participants are aware of the removal policy when they apply to participate in the Ramadan diet.

[28] Plaintiff proposes alternatives that seem "obvious" and "easy" to him, and which would certainly be "easy" on an inmate who wants a special accommodation so that he may participate in the fast, and yet not be held

Applying due deference to the Warden's concerns regarding security, discipline, and general administration, I find that the Warden has made a showing of the policy's reasonableness sufficient to pass scrutiny under the guidance of Turner. The present policy, which provides that a Ramadan fast participant who is observed taking other meals will be removed from participation from the fast, but will otherwise be afforded continued and undisturbed participation in all the other religious observances regularly available to him, is "reasonably related to legitimate penological interests" and does not violate an inmate's First Amendment free exercise rights. Turner, 482 U.S. at 89; see also O'Lone, 482 U.S. at 345 (implicitly recognizing the substantial burden placed on Muslim prisoners by a policy that prevented them from attending weekly congregational services, but holding that the prison regulations in question did not violate the First Amendment); Jackson v. Mann, 196 F.3d 316, 320 (2d Cir. 1999) (prison officials may inquire into sincerity of inmate requesting kosher meals); Brown-El v. Harris, 26 F.3d 68, 69-70 (8th Cir. 1994) (excluding an inmate who broke the Ramadan fast from further participation in no way restricted his religious freedom, stating that, "[r]ather than burdening Ramadan worshippers, the [prison] policy allows full participation in the fast and removes from the procedures only those worshippers who choose to break the fast"); McElyea v. Babbitt, 833 F.2d 196, 198 (9th Cir. 1987) (prison authorities may deny insincere requests for religious meals); 28 C.F.R. § 548.20(b) (2005) (Federal Bureau of Prisons inmates may be removed from religious diet accommodation for violation of diet requirements). Accordingly, I will grant the Warden's motion for summary judgment on plaintiff's free exercise claim seeking declaratory and injunctive

---

to keeping the fast, despite the lengths and measures taken so that he may participate in it. Functions of prison management must be left to the broad discretion of **prison administrators** to enable them to manage prisons safely and effectively. Gaston v. Taylor, 946 F.2d 340, 343 (4th Cir. 1991). I am convinced that his proposals are neither "obvious" nor "easy" for the purpose of managing a maximum security prison.

34

relief.

### 3. Due Process

The Court of Appeals remanded the case "for further proceedings on the due process claim against Lee in his official capacity," directing this court to "evaluate in the first instance (1) whether Lovelace has a liberty interest in Ramadan observance that is protected by the Due Process Clause and (2) if so, whether the prison's post-deprivation grievance process, which lasted nearly two months and ended one month after Ramadan, was unconstitutional in its failure to guard against erroneous deprivations and arbitrary decisionmaking." Lovelace, 472 F.3d at 202-03 (citing Wilkinson v. Austin, 545 U.S. 209, 220-221 (2005)).

To succeed on his challenge of the prison Ramadan policy on procedural due process grounds, plaintiff must show the following: that he was denied a liberty interest protected by the Due Process Clause, an interest that can arise either from the Constitution itself or from state laws or policies, Wilkinson, 545 U.S. at 226; that this denial imposed on him an "atypical and significant hardship . . . in relation to the ordinary incidents of prison life," Sandin v. Conner, 515 U.S. 472, 484 (1995); and that the process the state prison employed was constitutionally inadequate, Wilkinson, 545 U.S. at 225-26. The adequacy of the procedures in place is assessed by balancing the three factors set forth in Mathews v. Eldridge, 424 U.S. 319, 335 (1976): (1) the private interest affected by the government action; (2) the risk of erroneous deprivation through the procedures used and the probable value, if any, of alternative or additional procedures; and (3) the state's interest, including the function involved and the fiscal and administrative burdens of added safeguards. See also Wilkinson, 545 U.S. at 225-26. The third factor encompasses the state's interest in prison management, particularly in allocating scarce resources and in maintaining order, security, and

35

discipline. <u>Lovelace</u>, 472 F.3d at 202 (citing <u>Wilkinson</u> at 226-28, and <u>Wolff v. McDonnell</u>, 418 U.S. 539, 556 (1974) (recognizing that there must be "mutual accommodation" between institutional needs and inmates' constitutional protections)).  "[T]o establish liability under § 1983, Lovelace must show that the defendants acted intentionally in depriving him of his protected interest.  Because the protections of the Due Process Clause are not triggered by the 'mere failure to take reasonable care,' negligent deprivations are not actionable under § 1983." <u>Id.</u> (citing <u>Pink v. Lester</u>, 52 F.3d 73, 75 (4th Cir. 1995), and <u>Daniels v. Williams</u>, 474 U.S. 327, 330-31 (1986)).

The Court of Appeals stated that this court

> failed to address Lovelace's due process claim, presumably because it had already concluded that "the actions of defendants were negligent rather than intentional." But this conclusion (even if it were correct as to all the defendants) has no bearing on Lovelace's official-capacity suit against [the Warden] for issuing the policy. Lovelace alleges that the policy by its own terms allowed due process violations in the identification and removal of offenders from the pass list.

<u>Id.</u> (internal citations omitted).  The Court acknowledged that plaintiff's "due process claim might ultimately fail," but was "mindful" that it is "'a court of review, not of first view.'" <u>Id.</u> at 203 (citing <u>Cutter</u>, 544 U.S. at 718 n. 7).  The Court added that

> [s]everal considerations counsel against our rejection of this claim without the benefit of district court consideration.  The second <u>Mathews v. Eldridge</u> factor instructs a court to consider "the risk of an erroneous deprivation . . . through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards." 424 U.S. at 335. Here, when Lovelace filed his unsuccessful grievances and complaints, prison officials limited their inquiry to determining that Officer Lester was standing behind his report that he had seen Lovelace break the fast. . . . **[Plaintiff]** urged prison officials to take additional steps at the time:  among other things, he **requested officials** to view the cafeteria surveillance tapes for the lunch period in question and **to show Lovelace's face card to Officer Lester in an effort to determine whether Lester had correctly identified him**. These additional steps were not taken, and the prison has not discussed their probable value, or lack of value, to the process.  Nor has the prison explained, under the third <u>Mathews v. Eldridge</u> factor, whether the additional steps would have imposed "fiscal and

36

administrative" burdens that made them impractical. Id.

Lovelace, 472 F.3d at 203 (internal and parallel citations omitted; emphasis added).

A liberty interest "may arise from the Constitution itself . . . or it may arise from an expectation or interest created by state laws or policies." Wilkinson, 545 U.S. at 221. In the instant case, plaintiff has a liberty interest in observing the Ramadan fast, derived from his constitutional free exercise right. However, it is clear from the Warden's motion and supporting affidavits that no due process deprivation exists. In the first instance, the Court of Appeals' opinion in this case made clear that "the protections of the Due Process Clause are not triggered by the 'mere failure to take reasonable care,'" and that "negligent deprivations are not actionable under § 1983." Lovelace, 472 F.3d at 202 (citations omitted). The Court, addressing plaintiff's RLUIPA claims, stated that the Warden and Assistant Warden's "decision to entrust [Officer] Lester's confirmation [of plaintiff's identification] reflects at most a failure to take due care with respect to the risk that [Officer] Lester was mistaken or deceptive." Id. at 196.

Moreover, the Warden's motion and supporting affidavits indicate that the grievance procedure in place does provide a mechanism for a quick resolution of a claim like plaintiff's, and is clearly adequate under Mathews v. Eldridge.[29] Steps two and three of the Mathews v. Eldridge test weigh in favor of the Warden, who asserts that the demands of prison management require a single, unitary grievance procedure, and not a variety of processes tailored to fit anticipated,

---

[29] In November 2002, plaintiff initiated complaints using the prison grievance procedure that, within a matter of days, received the attention of the prison's top administration. Two days after being removed from the pass list, plaintiff filed informal complaints with the Warden and Assistant Warden, one of which was addressed within one day, and the other within two days. He appealed the denial of his grievance through VDOC's formal grievance process, which provided two additional stages of review. At every stage, the denial of his grievance hinged upon Officer Lester's misidentification.

37

hypothetical circumstances.[30] In the instant case, the private liberty interest identified in the first prong of the Mathews v. Eldridge test is outweighed by the concerns identified in the second and third prongs. See 424 U.S. at 335. The Supreme Court has further stated that, when considering due process challenges, "federal courts ought to afford appropriate deference and flexibility to state officials trying to manage a volatile environment." Sandin v. Conner, 515 U.S. 472, 482 (1995).

As the Warden argues, it is simply not feasible for the prison to attempt to institute such all-encompassing procedures. The problem lies not with the process, but in the execution of the process when it came to Officer Lester's identification of plaintiff.[31] The policy as presently implemented, however, incorporates into the charging process an additional safeguard, which plaintiff requested, intended to lessen the risk of such misidentifications in the future. Now, the risk of misidentification and erroneous deprivation is lessened by the requirement that officers must make a positive identification of a pass list participant, relying on the inmate's identification card, before writing a report that charges the inmate with having broken the daylight fast. The new policy allows a plaintiff in Lovelace's circumstances an immediate opportunity to prove his innocence because the prison official must make a physical verification of the inmate's identification. To be sure, applying the second prong of the Mathews v. Eldridge test, the parties agree that no grievance procedure will

---

[30] Although plaintiff goes on at length as to how prison grievance procedures could be reconfigured to better accommodate and conform to the timing and duration of assorted religious observances, the Court of Appeals, addressing plaintiff's RLUIPA claim, specifically noted that "[i]t is premature and unnecessary to evaluate any remedy at this juncture because liability has not yet been considered, let alone decided, under the proper standard." Lovelace, 472 F.3d at 192 n. 6. Because I find that the current grievance procedure comports with the requirements of due process, there is no need for me to award relief in the form of an adjustment to the prison's grievance schedule.

[31] The process in November 2002 permitted, as it does now, the viewing of videotape evidence.

38

completely protect a plaintiff in Lovelace's circumstances from a prison guard's misfeasance.[32] 424 U.S. at 335. However, the third prong of <u>Mathews v. Eldridge</u> weighs decidedly in favor of the Warden, given the costs – both in terms of financial costs and daunting administrative burdens – entailed in changing the VDOC's grievance procedures to better accommodate a variety of religious calendars. 424 U.S. at 335. The VDOC's unitary grievance process, which provides for post-deprivation relief, satisfies the requirements of due process. <u>Parratt v. Taylor</u>, 451 U.S. 527, 543-44 (1981) (a post-deprivation hearing is sufficient to satisfy the requirements of due process). Moreover, the present policy incorporates the pre-deprivation protection of verification of the accused pass list participant's identification. KMCC's policy incorporates pre-deprivation and post-deprivation protections that are sufficient under <u>Mathews v. Eldridge</u>, in light of the Warden's detailed description of legitimate penological interests in a unitary grievance procedure. I find the policy to be constitutionally sound.

I take a limited exception, however, to the Warden's assertion that she has implemented a policy that requires that KMCC officers must make a positive identification of a pass list participant, relying on the inmate's identification card, before writing a report that charges the inmate with having broken the daylight fast. Plaintiff presents evidence indicating that, as of May 7, 2007, Major Newberry (allegedly the prison's chief of security) confirmed that "[i]t is not mandatory that an I.D. card be checked" before "writing **a** charge" for "violating **a** prison rule, such as taking two lunch trays." (Emphasis added.) Given that writing an incident report against a pass list participant for breaking the daylight fast is not the same thing as "writing **a** charge" for violating an unspecified

---

[32] In such circumstances, the courts remain open to protect inmates, who cannot be guaranteed the correct or just outcome by the grievance procedure in each and every circumstance. <u>See</u> <u>Wolff</u>, 418 U.S. at 579.

39

prison rule, plaintiff's evidence does not convince me that Warden Bassett has not implemented the policy requiring positive identification of a pass list participant, relying on the inmate's identification card, before writing a report that charges the inmate with having broken the daylight fast.

Accordingly, I will take the Warden's motion for summary judgment on plaintiff's procedural due process claim under advisement for a period of ten days from the entry of the order accompanying this memorandum opinion. The Warden is directed to provide documentation to this court, within the prescribed ten-day period, that she has, in fact, promulgated a rule that correctional officers must have verified a pass list participant's identification, by use of the participant's identification card, before the participant may be removed him from the pass list for breaking his accommodated religious fast.[33] The failure to submit such documentation will result in the denial of the Warden's motion for summary judgment on plaintiff's due process claim, and the claim will be transferred to the appropriate district court for further action.

### III. Officer Lester

The Court of Appeals stated that plaintiff had presented "enough evidence of culpability to survive Officer Lester's motion for summary judgment on the RLUIPA claim," and that "[t]he evidence raises a genuine question whether Lester acted intentionally in depriving Lovelace of his free exercise rights." Lovelace, 472 F.3d at 195. The Court found that the "proffered evidence indicates intentional conduct, which is surely sufficient to establish fault under RLUIPA," and that "[a] reasonable factfinder could conclude that Lester acted intentionally, perhaps even maliciously, in misidentifying Lovelace and in failing to correct his error during the remainder of Ramadan

---

[33] If the Warden chooses, such documentation may be submitted to the court in confidence, under seal, if warranted by legitimate security reasons.

40

2002." Id. at 196.  Therefore, the Court held that "Lester is not entitled to summary judgment on the merits of the RLUIPA claim."  Id.

Regarding the defense of qualified immunity, the Court observed that, "[b]ecause the facts support an inference that Lester acted intentionally in depriving Lovelace of his free exercise rights, Lester is not entitled to summary judgment on qualified immunity grounds," id. at 198, and that "under both the First Amendment and any straightforward interpretation of RLUIPA, the unlawfulness and unjustified deprivations of Ramadan meals was apparent at the time of the incident," id. at 199.  "Lester's state of mind," the Court found, "is therefore critical to determining whether a reasonable person in his position would have understood that his conduct violated clearly established rights," and

> [i]f Lovelace succeeds in showing that Lester intentionally blocked his observance of Ramadan in violation of RLUIPA's basic protections, then Lester would not be entitled to qualified immunity. Because there is on this record a genuine issue of material fact as to whether Lester intentionally and purposefully infringed Lovelace's free exercise rights — rights clearly established at the time under RLUIPA and the First Amendment — Lester is not entitled to qualified immunity at this stage on the RLUIPA claim.

Id. (citations omitted).

Regarding this court's assessment of Officer Lester's state-of-mind in removing plaintiff from the pass list and in failing to correct his misidentification of plaintiff, the Court of Appeals found that this court had "underestimated the strength of the evidence against Lester," adding that "[t]he facts, taken in the light most favorable to Lovelace, raise a genuine dispute whether Lester acted intentionally in depriving Lovelace of his free exercise rights."  Id. at 202.  The Court noted that it was not deciding "whether Lester is entitled to qualified immunity on the free exercise claim because he did not raise this defense in his motion for summary judgment," but added that its "earlier

41

evaluation of whether Lester is entitled to qualified immunity on the RLUIPA claim has some bearing on this question." Id., n. 10.

The instant motion for summary judgment states that it was "filed solely to address the injunctive relief claims that the Court of Appeals identified" and that it did "not further address the matter of Defendant Lester's liability to Lovelace for money damages, as the Fourth Circuit's Memorandum Opinion indicates that resolution of that issue will turn on whether Lester had an improper motivation for identifying Lovelace incorrectly." Because Officer Lester's liability turns on a determination of credibility, and Lovelace has invoked his right to a jury trial, the matter will be set for a jury trial in the Abingdon Division of the Western District of Virginia, where the incidents giving rise to the claim occurred. Accordingly, this case will be transferred to the docket of the Honorable James P. Jones, Chief United States District Judge for the Western District of Virginia, for further action. Officer Lester is hereby directed to file an answer to the complaint within ten days of the entry of the order accompanying this memorandum opinion.

## IV. Conclusion

For the foregoing reasons, defendants' motion for summary judgment will be granted in favor of the Warden as to plaintiff's RLUIPA and free exercise claims. A ruling on the Warden's motion for summary judgment on plaintiff's procedural due process claim will be stayed for a period of ten days from the entry of the order accompanying this memorandum opinion, within which the Warden shall submit documentation to this court that she has, in fact, promulgated a rule that correctional officers must have verified a pass list participant's identification, by use of the participant's identification card, before the participant may be removed from the pass list for breaking his accommodated religious fast. The failure to submit such documentation will result in the denial of

42

the Warden's motion for summary judgment on plaintiff's due process claim, and the claim will be transferred to the appropriate district court for further action. The remaining claims against Officer Lester will be transferred to the docket of the Honorable James P. Jones, Chief United States District Judge for the Western District of Virginia, for further action. An appropriate order will be entered this day.

**ENTER:** This _24th_ day of August, 2007.

Senior United States District Judge

Case 7:03-cv-00395-JPJ-mfu   Document 81   Filed 08/24/07   Page 43 of 43   Pageid#: 324